UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SUCCESS ACADEMY CHARTER SCHOOLS – NYC,

Plaintiff,

-against-

BETTY A. ROSA, in her official capacity as Commissioner of Education of the State of New York and President of the University of the State of New York,

Defendant.

Civil Action No. 1:26-cv-7298

**COMPLAINT**

Plaintiff Success Academy Charter Schools – NYC ("Success Academy" or "Success"), by its attorneys, alleges as follows:

## NATURE OF THE ACTION

1. This is an action under 42 U.S.C. § 1983 to vindicate Success Academy's rights under the First and Fourteenth Amendments to the United States Constitution.

2. The case concerns a simple but consequential question: Does a public charter school have the right to communicate truthful information about its own students' academic achievements to a willing publisher through the independent testing organization that possesses and can authenticate that information? Success Academy submits that it does.

3. Success Academy operates a high school whose students participate extensively—and with extraordinary success—in Advanced Placement ("AP") courses and examinations, which are developed and administered by the College Board.

4. Success Academy has made rigorous college preparation and broad access to AP coursework central features of its educational model. It does not limit demanding AP coursework to a small, academically elite group. Rather, it gives students from all backgrounds access to genuinely challenging, college-level academic work.

5. Success Academy's students have responded by producing exceptional AP results. This year, more than 3,000 Success Academy scholars took 7,810 AP examinations across 18 subjects—with an average pass rate of 68 percent.

6. Fewer than 25 percent of high school students nationally pass at least one AP examination by the time they graduate. By contrast, 95 percent of Success Academy's 2026 graduating class passed three or more AP examinations, 79 percent passed five or more, and 60 percent passed seven or more. They outperformed their New York and global peers on nine AP examinations, including U.S. and European History, Macroeconomics, Microeconomics, and Literature.

7. Those results are among the most objective and compelling evidence of the rigor of Success Academy's high-school program and of its students' readiness for college.

8. Success Academy therefore wants those results known. It wants them known to families of prospective students who are seeking a rigorous education for their children; to the colleges and universities to which Success Academy's students are applying; and to journalists, educators, policymakers, philanthropists, and the public.

9. Success Academy particularly wants these results known to U.S. News & World Report ("U.S. News"), which publishes one of the country's most widely disseminated high-school rankings. And U.S. News, in turn, wants to receive that information. Understandably, however, it doesn't accept individual schools' self-reported AP results. To

provide comparability and assurance of accuracy, it relies on information supplied and authenticated by the College Board. This makes the College Board indispensable to the particular communication at issue. Success Academy cannot make itself an independent third-party verifier of its own test results. For the communication U.S. News requires, Success Academy must speak through the College Board.

10. Success Academy has authorized the College Board to transmit its AP performance information to U.S. News. However, Defendant Betty A. Rosa ("Commissioner Rosa"), acting through the New York State Education Department ("NYSED"), has prohibited the College Board from sharing AP results for New York schools with U.S. News & World Report.

11. Consequently, U.S. News was unable to consider New York schools' AP participation and performance when calculating its rankings. Instead, as it informed readers, it had to calculate the affected college-readiness measures for New York schools solely from International Baccalaureate ("IB") examination participation and performance.

12. NYSED thus created a remarkable disparity: New York schools whose students take IB examinations can receive credit for externally administered advanced examinations, while those whose students take AP examinations cannot.

13. The effect on Success Academy was dramatic.

14. Last year, when AP participation and performance were included in the U.S. News methodology, Success Academy's High School for the Liberal Arts Harlem ranked 11th in New York State and 9th in New York City, the only school to rank this high that doesn't have selective admissions.

15. This year, Success Academy's New York State ranking fell to 196th statewide.

16. This extraordinary change wasn't caused by a collapse in Success Academy's academic performance. Its students did not suddenly cease performing successfully. Its curriculum did not suddenly become dramatically less rigorous. Its AP program did not disappear. To the contrary, students at Success Academy did even better on their AP exams this year than in prior years.

17. What changed was that NYSED prohibited the College Board from supplying AP information to U.S. News. And because U.S. News requires independent verification, Success could not cure the problem simply by supplying the data on its own. The result was a government-created information blockade.

18. Supreme Court precedent establishes that dissemination of factual information is speech. It likewise establishes that the government cannot evade the First Amendment by directing its restrictions against a distributor, agent, petition circulator, or other intermediary through whom the principal speaker communicates.

19. The First Amendment does not permit a State to accomplish indirectly what it cannot constitutionally accomplish directly. Thus, just as NYSED may not prohibit Success Academy from sharing its AP results with U.S. News, it may not achieve that result by prohibiting such communication by the only intermediary capable of carrying the communication in the form U.S. News requires.

20. The challenged policy is especially consequential against the backdrop of New York's move away from Regents-examination requirements and other forms of test-based accountability. That policy shift has occurred amid sustained advocacy by New York State United Teachers ("NYSUT") to reduce the role of standardized testing in graduation requirements, teacher evaluation, and school accountability.

21. AP examinations provide the type of externally administered, nationally comparable evidence of academic mastery that becomes especially valuable as New York reduces reliance on its own statewide examinations. Success Academy has adopted AP requirements for graduation in part to escape the dumbing down of the New York high school diploma that NYSUT has promoted and Commissioner Rosa has effectuated.

22. Success Academy has the right to communicate that it maintains a rigorous academic program and that earning one of its diplomas is a genuine accomplishment. Commissioner Rosa, acting under color of law, has prevented Success from doing so thereby violating its First Amendment rights.

## **THE PARTIES**

23. Plaintiff Success Academy is an education corporation that operates numerous charter schools including the Success Academy High School of the Liberal Arts.

24. Defendant Betty A. Rosa is Commissioner of Education of the State of New York and President of the University of the State of New York. She is responsible for administration and enforcement of NYSED policies, practices, directives, and determinations challenged in this action. At all relevant times she has acted under color of state law.

## **JURISDICTION AND VENUE**

25. This action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

26. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

27. This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

28. Plaintiff seeks prospective declaratory and injunctive relief against Defendant Rosa in her official capacity to end an ongoing violation of federal law. Such relief is permitted under *Ex parte Young*, 209 U.S. 123 (1908).

29. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2). Success Academy's affected high-school operations are located within this District; it communicates with its students, families, prospective families, colleges, donors, supporters, journalists, and members of the public from within this District; and its reputational, competitive, student-centered, and expressive injuries caused by Defendant's conduct are suffered within this District.

## SUCCESS ACADEMY'S EDUCATIONAL MODEL EMPHASIZES ACADEMIC RIGOR

30. AP courses permit students to undertake college-level academic work while still in high school. They also provide a nationally standardized means of measuring mastery of that work.

31. Success Academy believes that demanding academic opportunities should not be restricted to children from affluent families or selective neighborhoods. It also believes that rigorous coursework should not be restricted to a small subset of its own students. It has therefore sought to make advanced coursework a broad feature of its high-school experience.

32. Success Academy students participate extensively in AP coursework and examinations. Over the course of high school, each Success Academy student must sit for at least 18 AP examinations to graduate. They have achieved exceptional results on these exams.

33. Those results are particularly meaningful because they come from an examination system external to Success Academy. They provide an independent national benchmark. Success Academy therefore regards its AP results as significant evidence that its educational model works.

34. The results also provide evidence that students who historically have been denied access to demanding college-level coursework can succeed when given strong instruction and high expectations. Success has a strong interest in communicating that evidence.

**THE SPEECH AT ISSUE BENEFITS SUCCESS ACADEMY'S STUDENTS**

35. Success Academy's interest in communicating its AP results is not merely institutional. Its students themselves have an important interest in accurate public recognition of the academic rigor they have undertaken.

36. Success Academy students devote substantial time and effort to difficult AP courses. They prepare for nationally administered examinations. They earn strong results.

37. Those accomplishments form part of the academic context in which colleges and universities evaluate Success Academy graduates.

38. College admissions offices do not evaluate applicants in a vacuum. Inevitably, the reputation and publicly understood academic profile of a high school can affect how the achievements of its graduates are understood. Success's students benefit when the rigor and quality of the education they have received are accurately understood. They should receive the recognition they have earned for undertaking and succeeding in demanding coursework.

39. A policy that suppresses one of the strongest objective indicators of that academic environment therefore injures not only the school as an institution. It also harms the students whose accomplishments the suppressed information describes.

40. Success Academy's desire to communicate its AP results is accordingly part of its educational mission. It seeks to ensure that the students it educates receive full recognition for the work they have accomplished.

**U.S. NEWS PROVIDES A MAJOR CHANNEL THROUGH WHICH ACADEMIC INFORMATION REACHES THE PUBLIC**

41. U.S. News publishes widely followed rankings of American high schools. The rankings attract national and local media coverage. Families consult them when comparing schools. Educators and policymakers discuss them. Colleges, donors, prospective employees and other members of the public consider them when deciding whether to support or associate themselves with a school.

42. To be sure, the U.S. News rankings aren't a perfect measure of educational quality. No ranking system could be. But they are based on objective data and their influence is therefore indisputable. That influence makes the accuracy and completeness of the underlying information important.

43. AP participation and performance have historically formed an important part of the U.S. News evaluation of college readiness and curricular breadth. For a school such as Success Academy, whose students participate extensively and successfully in AP examinations, those measures are particularly consequential. Omitting them removes one of Success Academy's strongest objective indicators of academic rigor.

**THE COLLEGE BOARD IS SUCCESS ACADEMY'S NECESSARY AND AUTHORIZED CONDUIT**

44. The College Board administers the AP program and maintains the authoritative AP examination information upon which publishers such as U.S. News can rely.

45. U.S. News has chosen to rely upon the College Board to obtain AP information rather than accepting self-reported AP claims from individual schools. That decision is understandable. Rankings involving thousands of institutions require comparable and reliable data. A school's own assertion about its performance does not provide the same independent assurance as information supplied by the organization that administers the examinations.

46. Consequently, Success Academy cannot effectively communicate its AP scores directly to U.S. News. It cannot make itself an independent verifier.

47. The College Board is therefore not merely a convenient alternative channel; it is the indispensable intermediary for the communication U.S. News will accept.

48. The underlying information is truthful factual information about Success Academy's students and program.

**NEW YORK INTERVENED IN THE COMMUNICATION**

49. U.S. News requested authorization from states for the College Board to provide AP data. For the 2026 ranking cycle, NYSED prohibited the College Board from providing this information. U.S. News therefore based its College Readiness and College Curriculum Breadth calculations for New York schools solely upon IB participation and performance.

50. The causal chain is direct: NYSED prohibited the College Board from sharing AP data for New York schools; U.S. News therefore did not use those data; and Success Academy's ranking fell dramatically.

**NYSED DOES NOT PROVIDE AN EQUIVALENT ALTERNATIVE**

51. NYSED has suggested that school-performance information may be obtained through State data sources. It can't. Success Academy personnel have reviewed the relevant State data sources. The AP information necessary for the U.S. News' rankings is absent, suppressed, incomplete, or otherwise unavailable.

52. Thus NYSED simultaneously refuses to provide the necessary information itself and prevents the authoritative independent source from providing it. That is not an alternative channel of communication. It is the elimination of the channel.

**THE NEW RANKINGS PRODUCE STRIKING AND COUNTERINTUITIVE RESULTS**

53. The effect of New York's decision is visible not only in Success Academy's own ranking. Removal of AP information has dramatically altered the standing of numerous New York schools.

54. Some schools widely recognized for exceptional academic performance have fallen sharply because an important component of their academic achievement is no longer reflected in the ranking methodology. Conversely, other schools have risen substantially or now appear above schools that historically ranked among the most academically selective and highly regarded public high schools in New York.

55. One particularly stark example is Mott Hall Bronx High School.

56. 33 percent of Mott Hall's students are proficient in math compared to 97 percent of Success Academy students. However, in the current U.S. News rankings, Mott Hall ranks above Success Academy. That is because Success receives no credit for College Readiness or College Curriculum Breadth since its AP exam results aren't reported while Mott Hall is ranked 27th and 24th in these categories based on IB examination data that NYSED permits to be reported.

57. The current rankings also produce striking results involving several other New York City schools. For example, Harlem Village Academy and Brooklyn Prospect Charter School now rank above Stuyvesant High School and the Bronx High School of Science in the U.S. News rankings because they utilize an IB curriculum.

58. To be sure, Harlem Village Academy and Brooklyn Prospect are strong schools, but Stuyvesant and Bronx Science are among the most academically selective and historically

distinguished public high schools in the country, with extensive advanced coursework and exceptionally strong student academic performance.

59. A methodology under which schools can abruptly move above or below institutions of that character—not because their underlying academic programs suddenly changed, but because New York prevented an entire category of AP information from being considered—demonstrates the distorting effect of the State's decision.

60. AP and IB are comparable advanced academic programs for purposes of the U.S. News rankings. Both provide high-school students with college-level coursework and externally administered examinations, and both furnish nationally or internationally standardized measures of students' participation in and performance on advanced academic work.

61. Indeed, for purposes of the relevant U.S. News methodology, AP and IB results serve substantially the same function: each provides objective evidence of the extent to which a school offers rigorous, college-level academic opportunities and the extent to which its students successfully complete advanced academic examinations.

62. Success Academy does not contend that IB results should be excluded from the rankings. To the contrary, IB participation and achievement are relevant academic information and appropriately should be considered. The constitutional and practical problem is that New York permitted IB achievement to remain available for consideration while preventing comparable AP achievement from being considered alongside it. If one form of standardized advanced academic achievement is relevant to the rankings, there is no academically coherent reason to suppress the other.

63. The resulting rankings therefore do not merely omit information about Success Academy. They systematically disadvantage New York schools that rely principally on AP rather

than IB, even though the two programs provide comparable evidence of college-level academic rigor and student achievement.

64. The result is a materially less complete and misleading picture of academic performance across New York high schools, driven not by differences in school performance but by New York's selective suppression of one category of otherwise comparable academic information.

65. The consequences are particularly serious since U.S. News rankings are widely disseminated and often reported without an explanation that New York schools were evaluated under an unusual methodology that excluded AP results.

**NEW YORK IS SIMULTANEOUSLY MOVING AWAY FROM OBJECTIVE STATEWIDE GRADUATION EXAMINATIONS**

66. New York's AP restriction must also be understood against the State's ongoing transformation of its high-school graduation requirements.

67. Historically, New York has required students seeking a Regents diploma to demonstrate proficiency through statewide Regents examinations. The Regents examinations provided a common statewide benchmark across schools and districts.

68. NYSED and the Board of Regents are now dismantling that requirement. NYSED's published transition plan provides that diploma assessment requirements are to be phased out. Students in certain cohorts will still take Regents examinations but will no longer need to pass them in order to receive a diploma. Subsequent cohorts are contemplated to receive a New York State high-school diploma without separate Regents assessment requirements.

69. Replacing common external examinations with more locally variable demonstrations of competency will not preserve the same level of objective academic accountability. Students will graduate without demonstrating minimum proficiency on objective

statewide examinations. These changes will further weaken the academic significance of a New York diploma.

70. If a State chooses to place less weight on its own standardized exit examinations, nationally standardized indicators of academic performance become especially valuable to parents, colleges, and members of the public seeking objective information. AP examinations supply such information. New York has nonetheless acted to keep that information out of a prominent national school-performance publication.

**NYSED HAS REDUCED TEST-BASED ACCOUNTABILITY AT NYSUT'S BEHEST**

71. The State's policy direction has not developed in an institutional vacuum. NYSUT is a major participant in New York education policy.

72. NYSUT represents educators throughout the State and maintains substantial political and policy influence. NYSUT has made reduction of standardized testing and test-based accountability a significant public priority. In 2023, NYSUT issued a report entitled *More Teaching Less Testing*. In it, NYSUT called for new pathways to graduation that would not rely upon Regents examinations. Its recommendations included capstone projects, project-based learning, performance assessments, experiential learning, career and technical education, and other alternatives to examination-based graduation requirements.

73. NYSUT also advocated reducing the use of standardized testing in teacher evaluations and school-accountability decisions.

74. NYSUT has not concealed its influence on the graduation-policy debate. To the contrary, NYSUT publicly celebrated NYSED's subsequent recommendations. NYSUT stated that the State Education Department's Blue Ribbon Commission recommendations "closely align" with the union's More Teaching Less Testing recommendations.

75. NYSUT described the recommendations as following years of union advocacy to limit emphasis on standardized testing and its president characterized NYSED's proposals as a welcome development.

76. NYSUT has also publicly advocated limiting the use of high-stakes tests for school ratings and teacher evaluations. That agenda is directly relevant to the public-policy setting in which NYSED has now prevented dissemination of objective AP performance information. This context makes the challenged suppression of AP information especially worthy of constitutional scrutiny.

## AP EXAMINATIONS PROVIDE AN EXTERNAL STANDARD THAT THE STATE CANNOT CONTROL

77. There is another important distinction between AP examinations and increasingly localized graduation measures.

78. Success Academy does not set the AP standard. NYSED does not set it. A local superintendent does not set it. Classroom teachers do not. AP examinations exist entirely outside of the ordinary State and local education bureaucracy.

79. That independence is part of its informational value. It permits the public to evaluate Success Academy against an objective benchmark that Success Academy did not create for itself.

80. For that reason, AP results are an unusually valuable form of speech concerning educational performance. They allow Success Academy to say, in substance: "Don't take our word for it. Our students have been measured against a national external standard." New York has prevented Success from delivering that authenticated message through the entity that administers the standard.

## SUCCESS ACADEMY HAS SUFFERED AND CONTINUES TO SUFFER CONCRETE INJURY

81. Success Academy's injury is not hypothetical. Its ranking fell dramatically after AP information was excluded. The revised ranking is presently available to members of the public. Families encounter it. Journalists can report it. Prospective employees and potential supporters can see it. Colleges may encounter the public profile of Success Academy through the same information ecosystem.

82. Success Academy's institutional reputation is therefore affected. Its competitive position is affected. Its students are affected because the public academic profile of their high school no longer reflects one of its strongest objective accomplishments.

83. And Success Academy's First Amendment rights are affected because the State prevents it from making an authorized truthful communication through the only independent source capable of authenticating it for the intended recipient.

84. The harm will recur. U.S. News has indicated that it expects to seek New York's authorization again. Unless Defendant changes the challenged policy or is enjoined, Success Academy faces repetition of the same injury in future ranking cycles.

## FIRST CAUSE OF ACTION
## 42 U.S.C. § 1983
## VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS

85. Success Academy has a First Amendment right to communicate truthful, factual information concerning its academic program and its students' academic performance.

86. The creation and dissemination of truthful information constitute speech protected by the First Amendment. See *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("the creation and dissemination of information are speech within the meaning of the First Amendment"). *Sorrell* rejected the premise that the disclosure of factual information could be treated as mere

conduct outside First Amendment protection. The AP participation and performance data at issue here likewise communicate factual information about Success Academy's academic program and its students' achievement, and that speech bears directly on public education, school quality, and college readiness.

87. Success Academy wishes to communicate its AP participation and performance information to U.S. News for purposes of accurately describing the academic performance of its high school and permitting that performance to be considered in U.S. News's rankings.

88. U.S. News is a willing recipient of that information. The First Amendment protects the right to receive information as well as the right to speak. *See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976).

89. Here, Success Academy wants to provide information and U.S. News wants to receive it, but U.S. News requires that AP information used in its rankings come from an authoritative independent source rather than from a school's own self-reporting. The College Board, which administers the AP program and possesses the official AP examination data, therefore serves as Success Academy's necessary and authorized conduit for communicating and authenticating that information in the form U.S. News requires.

90. Commissioner Rosa, acting under color of state law, maintains, enforces, or is responsible for a policy, determination, directive, refusal, or legal position that prevents the College Board from transmitting Success Academy's AP examination information to U.S. News notwithstanding Success Academy's authorization.

91. Commissioner Rosa has thereby prevented Success Academy from communicating its AP examination results through the only intermediary capable of authenticating that information in the manner required by U.S. News.

92. Commissioner Rosa's conduct directly and substantially burdens Success Academy's protected speech.

93. The constitutional injury is not eliminated because the State has imposed its formal restriction upon Success Academy's intermediary rather than upon Success Academy itself. The government may not accomplish indirectly, through pressure upon or restrictions imposed on a third-party intermediary, what the Constitution forbids it from accomplishing directly. See *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963); *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).

94. The Supreme Court has repeatedly applied that principle where government burdens expression by acting against an intermediary or effective means of communication. See *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024); *Meyer v. Grant*, 486 U.S. 414 (1988). In *Meyer*, the Court rejected the contention that speakers suffered no constitutional injury because they remained free to advocate for their position themselves; disabling an effective third-party means of reaching the intended audience burdened the speakers' own First Amendment rights.

95. The same principle applies here. Defendant's restriction targets a specific category of truthful factual information: information concerning student participation and performance on Advanced Placement examinations. The restriction is therefore content based because whether the information may be communicated depends upon its subject matter and content.

96. Content-based restrictions on protected speech are presumptively unconstitutional and ordinarily subject to strict scrutiny. See *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015). Defendant cannot demonstrate that the challenged restriction is narrowly tailored to serve a compelling governmental interest.

97. Student privacy does not justify the challenged restriction. Success Academy seeks disclosure only of aggregate, school-level AP participation and performance information suitable for evaluating the school; it does not seek publication of student names, addresses, contact information, or individual students' confidential score reports. Success Academy itself affirmatively authorizes disclosure of the aggregate information, which can be communicated without publicly identifying any individual student.

98. Even assuming that protection of student privacy constitutes a substantial or compelling governmental interest, prohibiting disclosure of aggregate school-level information that does not identify individual students is not necessary to protect that interest. *Sorrell* confirms that invocation of privacy does not remove a restriction on truthful information from First Amendment review. New York can protect personally identifiable student information while permitting authorized disclosure of aggregate institutional testing results.

99. The restriction is also underinclusive and discriminatory in operation because New York permits U.S. News to use comparable academic-performance information from the International Baccalaureate program while preventing disclosure of AP information. AP and IB both offer college-level coursework and externally administered examinations, and U.S. News uses participation and performance in both programs for substantially the same purposes in assessing college readiness and curriculum breadth.

100. Success Academy does not contend that IB schools should lose credit for their students' accomplishments. The point is that there is no evident privacy or academic rationale for permitting consideration of aggregate IB performance while preventing consideration of comparable aggregate AP performance.

101. The restriction is particularly burdensome because NYSED does not itself provide U.S. News with an alternative, complete, and authoritative source of the AP data; the State therefore forecloses the only effective channel through which Success Academy can communicate authenticated AP results for use in the rankings.

102. Even if the challenged restriction were analyzed under the standards applicable to commercial speech rather than as a content-based restriction on fully protected speech, it would still violate the First Amendment. *See Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980).

103. Success Academy seeks to communicate truthful information concerning lawful educational activity. Even assuming the State has a substantial privacy interest, a categorical prohibition on communicating aggregate school-level information that does not identify individual students does not directly advance that interest and is more extensive than necessary to serve it.

104. As a direct and proximate result of Defendant's conduct, Success Academy has suffered and continues to suffer concrete injury, including a dramatic decline in its U.S. News ranking, resulting reputational harm, and impairment of its ability to communicate accurately the quality and achievements of its academic program to current and prospective families, colleges, educators, policymakers, and the public.

105. These injuries are especially acute because U.S. News's rankings are widely disseminated and relied upon by members of the public in evaluating schools, and because the challenged restriction causes Success Academy's academic performance to be presented without a significant category of nationally standardized achievement data that U.S. News otherwise considers relevant.

106. Defendant's challenged conduct violates Success Academy's rights under the First Amendment, as incorporated against the States through the Fourteenth Amendment.

107. Defendant has acted and continues to act under color of state law within the meaning of 42 U.S.C. § 1983.

108. The violation is ongoing and, absent relief from this Court, threatens to recur in future publication and ranking cycles.

109. Success Academy has no adequate remedy at law.

110. Success Academy is entitled to declaratory and prospective injunctive relief pursuant to 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and:

A. Declare that Defendant's prohibition, refusal to authorize, or other restriction preventing the College Board from transmitting Success Academy's authorized, non-personally-identifying school-level AP participation and performance information to U.S. News & World Report violates the First and Fourteenth Amendments;

B. Preliminarily and permanently enjoin Defendant, her officers, employees, agents, successors, and persons acting in concert with her from enforcing any policy, directive, contractual restriction, interpretation, refusal, or other prohibition that prevents the College Board from transmitting Success Academy's authorized aggregate AP information to U.S. News;

C. Order Defendant to notify U.S. News and the College Board promptly that New York authorizes the College Board to transmit Success Academy's aggregate,

non-personally-identifying AP participation and performance data at Success Academy's request;

D. To the extent practicable, order Defendant to take the steps within her authority necessary to permit prompt transmission of Success Academy's AP information for consideration in the current ranking cycle, without directing U.S. News concerning the weight or treatment it must give that information;

E. Award Plaintiff its reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

F. Retain jurisdiction to ensure compliance with the Court's judgment; and

G. Grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
August 27, 2026

LAW OFFICES OF ERIC J. GRANNIS

By: s/ Eric Grannis
Eric J. Grannis
11 Broadway, Ste. 615
New York, New York 10004
(212) 903-1025
egrannis@grannislaw.com